REGAN, Judge.
Plaintiff, Beverly Silva, individually and as natural tutrix of her two minor children, filed this suit to recover damages for the wrongful death of her husband. Louis Silva was struck and killed by an automobile as he and Donald Bergens[1] were standing in the right traffic lane near the shoulder of U. S. Highway 90, endeavoring to pour gasoline into the tank of their station wagon. Plaintiff asserted that the proximate cause of the accident was the negligence of the defendant driver in, inter alia, failing to see the victim in order to avoid striking him and in driving while intoxicated.
Named defendants were George Allen, the operator and his alleged insurer, State Farm Insurance Company; Ted W. Preston, owner of the car; Government Employees Insurance Company, the liability insurer of one Lewis Williams, also named in the alternative as the owner of the vehicle (hereinafter referred to as GEICO); and Olympic Insurance Company, Bergen’s innsurer, from whom plaintiff sought redress under the uninsured motorist coverage clause in the policy should all other insurers avoid liability on a question of coverage.
The following positions were assumed by each of the respective defendants:
(1) George Allen averred that the proximate cause of the accident was Silva’s negligence in failing to light flares or to use other devices to signal oncoming motorists of his dangerous position. If this was not the sole cause, he alternatively pleaded, it at least constituted contributory negligence sufficient to bar Silva’s heirs’ recovery.
(2) State Farm denied insuring anyone involved.
(3) Ted Preston, one of the alleged owners, apparently moved to Michigan before *449 the trial and no pleadings were filed on his behalf.
(4) Olympic Insurance Company admitted it had issued a liability policy which was in effect on the Bergens’ vehicle but denied liability. Alternatively, it adopted the driver’s defenses predicated on negligence. It also impleaded Allen as a third-party defendant seeking judgment against him for any amount for which it might be cast.
(5) GEICO denied liability and pleaded contributory negligence as an alternative defense.
From a judgment dismissing plaintiff’s suit, plaintiff, Beverly Silva, has prosecuted this appeal.
The record discloses that on Saturday, October 21, 1967, the families of Louis Silva and Donald Bergens had gone on a picnic which occurred in Bay St. Louis, Mississippi. As they were returning to New Orleans in the Bergens’ station wagon, Sylvia Bergens, the driver, realized that the vehicle was running out of gasoline. She therefore coasted to the shell shoulder of U. S. Highway 90, managing to park the vehicle about six to twelve inches from the right edge of the highway. The car stalled v/ithin the city limits of New Orleans on the Chef Menteur Highway but this area of roadway is not illuminated by street lights. At this point the highway is divided into lanes, two for eastbound and two for westbound traffic. The westbound lanes, measuring from the edge of the neutral ground to the edge of the shoulder, are twenty-four feet in width.
Shortly after the car stopped, Louis Silva and Donald Bergens walked to a service station and returned with two gallons of gasoline. Their wives and six children awaited their return in the stalled car. When they began to pour the gas into the tank, it was approximately 8 P.M. and it was dark. The opening to the gas tank was in the left rear fender of the station wagon, approximately one and one-half feet from the rear of the car. In view of the fact that the car had been stopped so close to the right traffic lane, it was necessary for the men to stand in the right lane of the roadway, about two feet from the edge, to pour the gasoline. The parking lights of the station wagon were lit, but no flares were posted. Ber-gens explained that neither of their wives attempted to signal approaching traffic in the highway because their husbands thought it was too dangerous. Two were needed to service the car, one to hold the funnel and the other to pour the gas.
Initially, Silva held the funnel while Bergens poured, but when some of the gas was spilled, Silva suggested reversing the operation. Just as Silva began to pour, both men were struck by the automobile driven by Allen. Bergens, wearing a white shirt and medium green trousers, had been in a crouched position closer to the oncoming car, or on the side of the gas tank nearer the tail lights, while Silva was positioned on the other side of the tank. Bergens described being sandwiched between the moving car and his own parked car until it moved passed him and then he fell injured in the right traffic lane of the highway. With assistance he dragged himself off the highway onto the shoulder behind the station wagon. Silva apparently was killed instantaneously and his body was hurled or carried 124 feet west of the point of impact. They found him lying partially on the shoulder and partially in the right lane of the roadway.
Witnesses called for the plaintiff knew little or nothing of the movement of the defendant’s vehicle before it struck the two men. Bergens could only recount that the car “came up extremely fast” and “ * * * before I could notice or almost do anything about it we were hit.” Sylvia Bergens, seated in the driver’s position with her back resting against the left front door, first heard a bump against the car, and then saw a dark object passing so close to the window she could have touched it. She also noticed sparks, apparently caused by the gas can striking the roadway. She *450 described the defendant’s vehicle as traveling at a great speed. Mrs. Silva also was first alerted to the accident by a loud thump. She was on the rear seat of the station wagon.
As to lighting conditions at the scene of the accident, it was established that the parking lights of the station wagon were turned on, and there was some light from a roadside billboard and a motel on the other side of the highway. When the accident occurred, the only automobile parked on the shoulder of the highway was the Bergens’ vehicle.
There was only one witness available to describe the accident from the vantage point of the moving vehicle, i. e., the defendant driver. His testimony was elicited by the plaintiff on direct examination, after the lower court ruled plaintiff was not entitled to cross-examine this defendant under the act.[2] (The correctness of this ruling will be discussed more fully hereinafter.)
Defendant testified that he was driving a 1954 Pontiac with defective brakes, or as he put it “ * * * wasn’t ideal brakes.” He admitted to having three bottles of beer during the course of the day prior to this accident, the last of which was consumed at 5 P.M. He stated that about 7 or 7:30 P.M. he left Pearlington, Mississippi driving westward on Highway 90 toward New Orleans. When he was approximately three quarters of a mile east of the accident scene, he began driving in the neutral ground lane until another vehicle behind him flashed its lights indicating a desire by its driver to pass. We quote in part the transcript containing Allen’s account of the accident for the purpose of showing the difficulty experienced by plaintiff’s counsel as a result of being denied the right of cross examination.
“Q. How did this accident occur, Mr. Allen ?
“A. I was driving along the highway and I was in the inside lane and there was a car behind me flashing his lights to pass. So, I put my turn signal on and I started into the right lane and he pulled alongside me and just as he passed I felt my car contact — and I was watching the line margin because I had already seen three cars parked on the side of the highway. After I felt the contact, I thought someone had opened a door into the front of the car I was driving. I went about five hundred — I guess about five hundred feet on down the road, stopping, because I had already slowed down to turn off.
“Q. You said you were in the inside lane, what do you mean by inside lane?
“A. Next to the neutral ground.
“Q. How long had you been driving on the inside lane before the accident, how far a distance ?

“A. Approximately three-quarters of a mile.
“By Mr. Schaff:
“Q. Where did you first notice that someone behind you was flashing light to pass ?
“A. I guess that was about a thousand yards from the scene of the accident.
“Q. How soon thereafter did you change your lanes?
“A. I immediately began to pull into the right lane, then.
“Q. As you were driving in the right lane, what were you doing?
“A. I was kind of marginally checking his position as he passed.

*451

By the Court:
Q. What observation had you made of the right-hand side of the road?
'A. There was three cars parked alongside of the highway.
'By the Court:
'Q. When did you last look at these three cars, sir?
‘A. I suppose two or three seconds before.
'By the Court:
“Q. What brought these cars into focus, into your vision, sir, at the time?
“A. Headlamps.
“By the Court:
“Q. Your lights?
“A. Yes.
“By the Court:
“Q. What did you see with respect to those automobiles at the time your lights were on, did you see anything unusual ?
“A. No, sir, no people.
“By the Court:
“Q. Didn’t see any people ?
“A. No, sir.

“Q. Mr. Allen, on Exhibit p-30, the last photograph you have, could you tell us whether or not the picture reflects the condition of the automobile as of the time you took the automobile at 6:00 on the morning of October 21st, 1967?
“A. No, sir, it doesn’t.
“Q. What difference is there in the automobile ?
“A. The right front fender and headlamp is broken, I can tell you more about the car, too, after I had stopped I couldn’t even open either one of the front doors.
“Q. Mr. Allen, you mentioned that you had thought you struck a door of an automobile that might have been parked on the highway, is that correct?
“A. Yes, sir.
“Q. Do yon recall how fast you were going at that time ?
“A. I was doing under forty-five miles per hour.
“Q. Did anything happen to your automobile, that you felt anything, as you felt the force, that you might have struck or that came in contact with your automobile?
“Mr. Schaefer:
“Object to the question, confusing, misleading.
“By Mr. Scharf:
“Q. Did you have any sensation as your automobile struck this other object?
“A. Yes, sir.
“Q. What did you fell (sic) ?
“A. I felt the contact.
Q. Did you hear any noise of any kind?
A. Yes, sir.
Q. What kind of noise ?
A. Just felt like it was metal.
Q. Did you see anything happen?
A. No, sir.
Q. Did you observe any people on the highway then?
Mr. Schaefer:
“Objection, leading question,
“The Court:
“Don’t lead the witness.
*452 “By Mr. Schaff:
“Q. After you felt the sensation that you described before, what happened?
“A. I continued on further down the road to get past another vehicle that was parked, the third vehicle, and I pulled over, where after I got on the shoulder, wide enough to get on.
“Q. Where was the third vehicle parked in relation to the area where you felt the striking of an object?
“A. It was about, I guess a hundred foot or more ahead of the first two vehicles.
“Q. Where were the first two vehicles in relation to the area where you felt the striking of an object?
“A. They were to the side of the highway.
“Q. Were they in front of or in the rear of the area were you felt the striking of an object?
“A. No, it was — I thought it was the second vehicle had opened a door in front of the car as I passed.
“Q. Where would the first vehicle be, where would you place the first vehicle then ?
“A. The first vehicle was about four or five feet behind the second one.
“Q. What was the color of the first vehicle ?
“A. I don’t recall, sir.
“Q. Do you recall the color of any of the vehicles ?
“A. No, sir, I don’t.
“Q. Do you drink alcoholic beverages?
“A. Yes, sir.
“Q. Were you drinking on the night of the accident?
“A. I had three beers all day.
“Q. Where did you have those beers?
“A. The last one was about 5:00, on the way back to Pearlington to get the car.
“Q. Where did you have the beer?
“A. I think just across the Chef Bridge on the lefthand side going towards Pearlington. Irene’s, I believe the name of the restaurant, seafood restaurant.
“Q. Do you drink any alcoholic beverages stronger than beer?
“Mr. Toledano:
“Objection.
“Mr. Pate:
“Leading.
“By Mr. Schaff:
“Q. Do you drink any alcoholic beverage other than beer ?
“Mr. Schaefer:
“Objection, immaterial, irrelevant.
“The Court:
“As to being irrelevant, it’s overruled, as to being leading, of course, rephrase your question.
“Mr. Pate:
“I join in the motion of irrelevant, due to the fact this witness testified — already testified all he had was three beers.
“The Court:
“Still relative to find out if he imbibes alcoholic beverages.
“Mr. Schaefer:
“This is direct examination.
“The Court:
“I realize that.
“By Mr. Schaff:
“Q. Can you answer that question?
*453 “A. On that particular date, no.
“By Mr. Schaff:
“Q. What happened after you brought your car to a stop or the car you were driving to a stop ?
“A. I got out, after I climbed over the back seat, and walked around the car. Then I went back to the other car to see what had happened.
“Q. Did you observe either car, like the third car you mentioned, the second and third car then ?
“A. Yes.
“Q. Where was the third car in relation to the automobile that was involved—
“A. I still don’t know which automobile was involved.
“Q. You don’t?
“A. No, sir.
“Q. When you went back to the scene, what did you see there ?
“A. I seen that someone had been hurt.
“Q. Did you talk to anyone there?
“A. Yes, sir.
“Q. To whom did you talk?
“A. The police.
“Q. When you went back to the scene, were the police already there, then ?
“A. Yes, sir.
“Q. How long did it take you to get from where your car stopped to the scene of the accident?
“A. I suppose from the time I’d gotten out and checked the damage on that other car, maybe four or five minutes.
“Q. What did you tell the police there at the scene of the accident?
“A. I said I wanted to find out what had happened, that I hit something.
“Q. Then what happened to you ?
“A. Then they put me in a car, as soon as they went and looked at the other car, put me in the patrol car and said this is it.
“Q. Did you give the police a statement as to your opinion or your version of the accident?
“A. I had no questions whatsoever.
“Q. You didn’t talk to the police at all?
“A. Except to tell them that I hit something.” (Emphasis supplied)
While Allen relates that he made no statements to the police, it should be observed that the police report indicates that he was interviewed by one of the investigating officers, Patrolman Berno Scallan. By consent of counsel, it was admitted in evidence in lieu of the patrolman’s testimony with the stipulation that he would testify to the facts contained in the report if he were called as a witness. The report concerning Allen’s statement and appearance at the scene reads:

“Patn. Scallan interviewed operator of vehicle # 1 (Allen) whereby he produced a valid La. driver’s license number 1751733 and advised that he had been traveling inbound in the right lanes of the Chef Menteur Highway. Upon reaching the area of vehicle # 2 (The accident cite (sic) he felt his vehicle jerk and thought he had hit a car door. He began to apply his brakes and found that he could not stop his vehicle because the brakes were barely holding. He (Allen) stated that he traveled inbound for a short distance, then pulled over to the side of the road. He stated that he examined his vehicle and found that there was damage to the right front fender. After a while he noticed Police Cars outbound from his location on the Chef Menteur Highway. He (Allen) stated that he walked to the Police Cars and advised one of the Policemen that he thought he had hit something with his car.

*454 "While interviewing operator # 1 (Allen) Patn. Scallan detected a moderate odor of alcohol emitting from him (Allen); however, operator # l’s condition was such as to lend doubt as to influence, although an attempt to clarify any doubt regarding operator # 1 (Allen) condition was made by attempting to gain the services of the Central Lock Up for an Intoximeter examination or the Coroner’s Office for a blood alcohol test. These attempts were made through the Police Radio dispatcher for approximately thirty minutes. However due to the extreme amount of traffic on the Police Radio at this time and receiving no response through radio dispatching this attempt proved negative.
“Feeling that too much time had lapsed which would possibly substantiate or dispute the doubt of influence on the part of operator # 1 (Allen) Patn. Scallan abandoned this attempt.”
The police report indicated that the Pontiac, driven by Allen, stopped two-tenths of a mile from the site of the accident and its left front tire was flat. There was no fluid in the master cylinder of this vehicle. The report further discloses that a passerby arriving on the scene after the occurrence of the accident parked a short distance ahead of the station wagon on the shoulder of the road.
Predicated on the foregoing evidence, the lower court concluded that the proximate cause of the accident was the concurrent negligence of both defendant driver and Silva. While the judge did not state that he found Allen guilty of negligence, he denied recovery to plaintiff on the basis of contributory negligence, and of course, a finding of contributory negligence presumes some act of negligence, other than plaintiff’s, was a contributing proximate cause of the accident. The lower court also concluded that the doctrine of last clear chance was not applicable in view of this finding of fact. It’s opinion, reads in part, as follows:
“ * * * While refueling the station wagon, Mr. Donald Bergens and Mr. Louis Silva were standing on and into the highway about 2 feet. No flares or other physical warnings were given of the two men’s presence into the roadway on the side of and near the rear of the station wagon which they were refueling. The parking and rear lights of the vehicle were on.”
“The defendant Allen was proceeding on the Chef Menteur Highway going toward New Orleans in the lane next to the neutral ground. Upon noting the blinking headlights of a car following his, he maneuvered his vehicle into the right lane to clear the neutral ground lane for the following car to pass. Allen testified he was looking to his left to maintain a roadway position of his vehicle. He said that he saw automobiles parked on the shoulder of the road but he did not ever see either of the two men before impact. His first knowledge of some incident with his vehicle was when he felt a ‘thump’. He stopped to investigate and found he had hit the men.”
While we concur with the lower court’s finding that Louis Silva was negligent in standing in a darkened highway and in failing to signal approaching vehicles of his perilous situation, we are not entirely satisfied that the doctrine of last clear chance has no application. The defendant driver’s testimony is essential in determining whether this evidentiary rule should be invoked in this case because he was the only witness in a position to establish whether plaintiff’s position of peril could have been discovered in sufficient time for the defendant to have avoided striking him.
Our jurisprudence is settled to the effect that two conditions must concur before the doctrine of last clear chance will be applied, namely, (1) the injured party must have placed himself in a position of peril of which he was not aware or from which he could not extricate himself; and
*455 (2) the person against whom it is invoked either discovered or, by the exercise of reasonable care, should have discovered the hazard in sufficient time to avoid the accident. It is also axiomatic that one who would avail himself of the doctrine of last clear chance has the burden of establishing these conditions by a preponderance of the evidence.[3]
In this case this burden rested upon the plaintiff, who was denied the privilege of cross examining defendant Allen under LSA-C.C.P. Article 1634. This statute reads:
“Any party or his representative may be called as a witness and cross-examined by the adverse party without the latter vouching for his credibility, or being precluded from impeaching his testimony, and immediately thereafter the witness thus called may be examined or cross-examined to the extent otherwise permitted by law upon the subject matter of his examination in chief by such adverse party. The court may permit the recall and further cross-examination of the party or of his representative as often as it deems such action to be in the interest of justice.
“ ‘Representative’ as used in the paragraph above and in Article 1428(2) means an officer, agent or employee having supervision or knowledge of the matter in controversy, in whole or in part, whether or not he is in the employ of or connected with the party at the time his testimony is taken.
Amended by Acts 1970, No. 406, § 1.”
Relative to the issue of negligence, plaintiff was entitled to avail himself of the provisions of the above article. It was important to plaintiff’s case to elicit Allen’s testimony without vouching for his credibility or being precluded from impeaching it. The lower court’s refusal to permit cross-examination under the act was predicated upon the rationale emanating from the case of Rancatore v. Evans,[4] however, that ruling cannot be extended to deny plaintiff’s right to cross examine Allen with respect to the issue of negligence. In Rancatore, plaintiff and defendant Evans had an identical interest, i. e., to establish that a policy issued by defendant insurer covered damages to a boat held in bailment by Evans. One of the contentions urged was that the agent of the insurer led Evans to believe through misrepresentation that the policy covered boat explosions. To establish the alleged misrepresentation, plaintiff elicited Evans’ testimony on this point by cross-examination under the act. This court ruled the cross-examination had no probative value anent the insurer’s liability because, on this point, the interest of plaintiff and Evans were identical, and not adverse.
Having been improperly denied the right to cross-examine, plaintiff called Allen on direct. This, of course, placed plaintiff in a position of vouching for his credibility and ultimately the lower court accepted his recitation of facts in determining that Allen was not liable in conformity with the doctrine of last clear chance. Denial of the right to cross-examine made the plaintiff’s burden very difficult, more so than it would have been under more normal circumstances.
We therefore, in the interest of justice, are compelled to remand this case to permit plaintiff to avail herself of the right to cross-examine defendant Allen. As the record now stands, we noticed inconsistencies in Allen’s testimony at the trial as compared with his statements to the police after the accident.
While we have referred to some of the questionable areas of fact, we hasten to emphasize that we do not at this point find that the evidence would support or *456 eventually will support our reaching a factual conclusion that the defendant driver should have observed plaintiff’s peril in sufficient time to avert the accident. However, we are, to reiterate, convinced that in the interest of justice this matter should be remanded for additional proceedings consistent with the foregoing rationale with respect to cross-examination of Allen. The order of remand does not include as defendants GEICO or State Farm Insurance Company as insurer of Allen. After Preston was named defendant as owner of the vehicle who had loaned it to Allen, his deposition was taken. At that time GEICO was not a party nor was it represented at the deposition. In that deposition, introduced at the trial by a proffer, Preston testified he sold the car to Lewis Williams the day before the accident. In another deposition Williams denied buying the car or having any knowledge of Allen’s use thereof on the day of the accident. On the trial Allen simply testified he borrowed the car from Preston. The deposition of Preston could not be used as evidence against GEICO under LSA-C.C.P. Art. 1428, which provides in part:
“At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition * * (emphasis supplied)
Thus, plaintiff failed to adduce competent evidence, as against GEICO, that Preston had sold the car to Williams or that Williams was even aware of the loan of the vehicle to Allen.
In addition, plaintiff failed to prove that State Farm had a policy of insurance in effect insuring the defendant driver on the date of the accident. The evidence preponderates to the effect that Allen’s coverage lapsed on August 30, 1967, and the grace period for renewal passed without its being reinstated. The insurer’s final notice to the effect that the policy had lapsed was mailed to Allen September 25, 1967, almost one month prior to the accident.
For the foregoing reasons, the judgment appealed from is affirmed insofar as it dismisses plaintiff’s suit against State Farm Insurance Company and Government Employees Insurance Company; in all other respects the judgment is set aside and this case is remanded for additional proceedings consistent with the rationale appearing in this opinion. Assessment of costs is to await final determination of this cause.
Affirmed in part; set aside in part and remanded.

. This case was consolidated with a personal injury suit filed by Donald Bergens allegedly stemming from the same accident. This was done to facilitate and expedite the trial thereof. See Bergens v. Allen et ah, Ba.App., 256 So.2d 456.

. C.C.P. art. 1634.

. Connecticut Fire Ins. Co. v. Illinois Central R. Co., 212 So.2d 716 (La.App. 1968).

. La.App., 182 So.2d 102.